Filed 1/12/26  P. v. Kent CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL BRANDON KENT,<br><br>    Defendant and Appellant. | F087847<br><br>(Super. Ct. No. F23907130)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Gregory T. Fain, Judge.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Michael Brandon Kent was found guilty of second degree murder and an associated firearm enhancement was found to be true.

Defendant now appeals his conviction, asserting the trial court prejudicially erred and violated his Sixth and Fourteenth Amendment rights by excluding all prior offense evidence from being used to impeach one of the prosecution's witnesses. Defendant also argues the trial court erred in refusing to strike the firearm enhancement in total or strike it and impose a lesser firearm enhancement. The People dispute these contentions.

We vacate defendant's sentence and remand for full resentencing. In all other respects, the judgment is affirmed.

## PROCEDURAL HISTORY

On December 20, 2023, the Fresno County District Attorney filed an information charging defendant with the murder of James Buford (Pen. Code, § 187,[1] subd. (a)). The information also alleged defendant personally and intentionally discharged a firearm causing great bodily injury or death. (§ 12022.53, subd. (d)).

On February 20, 2024, the prosecution filed a motion in limine seeking a ruling on the admissibility of six prior convictions of one of its witnesses, a tipster. At a pretrial hearing, the court excluded all six of the tipster's prior convictions; she testified at trial as a witness for the prosecution. On February 29, 2024, the jury found defendant guilty of second degree murder and found the firearm enhancement true.

On April 2, 2024, the trial court sentenced defendant to an indeterminate term of 15 years to life for the murder, plus 25 years to life for the firearm enhancement.

Defendant filed notice of appeal on April 3, 2024.

## FACTUAL SUMMARY

James Buford was a volunteer host and resident at a public park in Fresno County. His duties included opening and closing the park for visiting hours, and he had the authority to ask people to leave the park but had no other enforcement powers. He had a

---

[1]     Undesignated statutory references are to the Penal Code.

2.

vest, county badge, spotlight, megaphone, and his own golf cart, but was not known or permitted to carry a gun.

On the evening of July 19, 2023,[2] Buford's body was discovered by an electric company worker investigating a power outage in the area. The body lay near a picnic bench, and the worker saw a bullet hole on the left side of Buford's face. Paramedics arrived and removed the body from the park; Buford was pronounced dead at the hospital.

Officers found a nine-millimeter shell casing stamped "FC" and "9MM" near Buford's body, and noted zigzag shoe prints, men's size 11 1/2, about two yards from the body. They also found a cigarette butt marked "LD" on a bench nearby. The worker testified that on his way into the park, he passed by a dark sedan parked about 100 to 150 yards outside the park. Officers noted an acceleration tire track where the sedan had been parked.

Days later, law enforcement received an anonymous tip that a person named "Brandon with a moniker of Gage" committed the murder. The tipster indicated "Gage" drove a black sedan and lived with his girlfriend and her three-year-old child. Detectives linked the name "Brandon … Gage" to defendant. A few days later, the tipster came forward, identified herself as a friend of defendant's girlfriend, and provided further information about defendant and the girlfriend.

On August 1, officers saw a black sedan with three chrome wheels and one front black wheel in defendant's driveway. A few weeks later, officers saw the sedan had four new tires. Officers linked the sedan to defendant via a warrant search and commercial surveillance footage. In a search of defendant's residence, law enforcement found firearm parts and magazines, a live nine-millimeter bullet, three chrome tires and one

---

[2] All further dates refer to the year 2023 except as otherwise noted.

regular black tire, and two cigarette butts with "LD" markings. A cell phone found in the bedroom stored the username "Gage" and a password "gage1FNG187."

Defendant's girlfriend was arrested on August 26 on unrelated charges; her DNA was collected. Officers arrested defendant at a traffic stop on August 27 after he told them he was Brandon Thomas from Missouri; defendant's DNA was collected. A DNA comparison to the cartridge casing found at the scene of the shooting indicated it was 124 billion times more likely defendant's girlfriend was a contributor with two other unknown individuals, than that three unknown individuals were contributors, and five billion times more likely defendant was a contributor with two unknown individuals than that three unknown individuals were contributors.

Defendant's girlfriend was Buford's niece. At trial, the girlfriend testified with a grant of immunity that she and her young child had not seen Buford for several years, and she had no contact with her family. She testified that on July 19, she left her child with a babysitter, then she and defendant spent the day smoking meth and driving around in defendant's black sedan; they ended up in the park that night. She testified she and defendant were making out on the bench when she saw headlights coming towards them from inside the park. She ran to the sedan, which was parked outside the park, thinking defendant was behind her. She heard arguing and recognized her uncle's voice but then heard a gunshot and the arguing stopped. She testified defendant came to the car and they drove home, but defendant did not say anything or answer her questions about what happened. She testified she knew defendant owned a black gun, and though she stated she never handled it, she said she may have picked up a bullet in the house to set it on the shelf. She testified that days later, she had a conversation with her friend, the tipster, about the night of the shooting.

The tipster testified at trial, recounting her conversation with the girlfriend. The tipster's testimony aligned with much of the girlfriend's testimony, except the tipster said

4.

the girlfriend told her she saw defendant shoot Buford and saw him throw a gun out the window as they drove away. The girlfriend denied she said these things to the tipster.

Officers seized a black cell phone from defendant during his arrest on August 27. The phone contained images of a black nine-millimeter subcompact firearm, a magazine, and live ammunition. The phone also contained a series of 12 text messages from July 20, a day after the shooting, between defendant and one of his colleagues. Therein, defendant texted he was "stress[ed]" but could not talk about it on the phone; he also texted "I got this b[****]'s kid. Kind of kidnapped him" and "I did some dumb [s***] … last night and the witness is MIA. So I can snatch her kid." The babysitter testified that on July 20, defendant came by himself to pick up the girlfriend's child. The babysitter also testified the girlfriend once told him Buford had tried to kiss her; the girlfriend denied this at trial.

## DISCUSSION

I. LIMITATION ON IMPEACHMENT OF THE TIPSTER WITH HER PRIOR CONVICTIONS

Defendant first argues the trial court prejudicially erred and violated his Sixth and Fourteenth Amendment rights by excluding evidence of all of the tipster's prior offenses from being used for impeachment purposes. We find all but the challenge to the tipster's 2012 misdemeanor to be forfeited and, as to that argument, we find no error.

### A. Additional Background

In a pretrial motion in limine, the prosecutor requested a ruling on the admissibility of the following eight of the tipster's convictions: a 1996 conviction for receiving stolen property (§ 496), resulting in a grant of three years' probation; 1998 convictions for providing false information to a law enforcement officer (Veh. Code, § 31) and driving a motorcycle without a license (Veh. Code, § 12500, subd. (a)), with no sentence indicated; a 2005 conviction for possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), resulting in a 16-month prison term; 2007 convictions for

5.

driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)) and possession of methamphetamine or heroin (Health & Saf. Code, § 11350, subd. (a)), resulting in a 16-month prison term; a 2012 misdemeanor conviction for presenting a false identification to a police officer (§ 148.9), with no sentence indicated; and a 2016 misdemeanor conviction for driving on a suspended/revoked license due to previously driving under the influence (Veh. Code, § 14601.2), with no sentence indicated. The motion noted the tipster was born in 1970. Defendant filed his own motion in limine but did not discuss the tipster's convictions.

At a pretrial hearing, the trial court found the 1996 conviction for receiving stolen property to be a crime of moral turpitude but noted it was 28 years old, and the tipster received probation. The court noted the 1998 convictions were misdemeanors but did not discuss them otherwise. The court noted the 2005 and 2007 convictions were not for crimes of moral turpitude. The court noted the 2012 and 2016 convictions were misdemeanors and were not "probative at all and very remote." The court concluded: "the only moral turpitude crime … is [a] felony from 1996. I think it's way too remote, and I don't think any of these others qualify in my view as to be impeached for whether it's conduct or a conviction." The following exchange then occurred:

> "[Defense Counsel]: Is, Your Honor, stating that [section] 148.9 is not a crime of moral turpitude?
>
> "[The Court]: I'm not sure. I'm saying it's so remote and it's such -- it's the conduct. I just -- under 352, that's not something I'm going to --
>
> "[Defense Counsel]: That was the only one that I was going to request. It's a crime of dishonesty. She lied to police.
>
> "[The Court]: It is, but 2012, you know, I don't know I can ever remember ever allowing a defendant to be impeached with that ever in all my trials, and I'm same with the witness. I just think it's too remote. It's too far off. It's misdemeanor conduct. So that's my ruling on that."

6.

*B.      Standard of Review*

On appeal, the exclusion of evidence is reviewed under the deferential abuse of discretion standard. (*People v. Anderson* (2018) 5 Cal.5th 372, 407 (*Anderson*).) When an error is one of nonstructural state law, appellate courts follow the harmlessness standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. This standard requires affirmance of the judgment unless the court concludes there is a reasonable probability a result more favorable would have been reached in the absence of the error. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1049.)

*C.      Analysis*

*1.      Forfeiture*

The People contend, and we agree, that defendant forfeited all but his challenge to the tipster's 2012 conviction. (Evid. Code, § 354, subd. (a); *People v. Ramos* (1997) 15 Cal.4th 1133, 1178 ["As a condition precedent to challenging the exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the 'substance, purpose, and relevance of the excluded evidence ….' "].) The "failure to raise [a particular] theory of admissibility at trial forfeit[s] the claim on review." (*People v. Pearson* (2013) 56 Cal.4th 393, 470, fn. 10.) At the pretrial hearing, the court issued its tentative ruling to exclude all of the tipster's prior convictions. Defense counsel responded that the 2012 conviction "was the only one [he] was going to request"; he made no argument as to the other convictions. Thus, defendant has forfeited any argument the tipster's other convictions should have been admitted for impeachment purposes for failure to raise the issues before the trial court. (*Pearson, supra,* at p. 470, fn. 10.)

Further, though defendant broadly contends on appeal all of the tipster's prior convictions should have been admitted, he only proffers arguments on three of the convictions: the 1996 felony conviction for receiving stolen property, and the 1998 and 2012 misdemeanor convictions for providing false information to law enforcement.

Defendant merely references the other convictions in his remoteness argument—that the tipster did not live a legally blameless life since commission of those offenses. Thus, even assuming defendant intended to challenge the trial court's exclusion of the 2005 felony conviction, 2007 convictions, and 2016 misdemeanor conviction, the argument is forfeited for lack of development on appeal.[3] (*Oak Valley Hospital Dist. v. State Dept. of Health Care Services* (2020) 53 Cal.App.5th 212, 228 [undeveloped arguments are forfeited on appeal].)

There are additional problems with defendant's arguments concerning the 2012 conviction. At the pretrial hearing, defendant only argued to admit the fact of the tipster's misdemeanor conviction. However, "[m]isdemeanor convictions themselves are not admissible for impeachment." (*People v. Chatman* (2006) 38 Cal.4th 344, 373 (*Chatman*).) True, evidence of the underlying *conduct* of a misdemeanor may be admissible subject to the court's exercise of discretion. (*Ibid.*) However, defendant made no offer of proof regarding the 2012 incident. Reviewing courts must be able to discern "what the underlying conduct was, whether or how it would have been significant, how defendant would have attempted to prove it, or whether he could have done so." (*Chatman, supra,* 38 Cal.4th at p. 373.) A defendant's failure to make an offer of proof or present any evidence of the underlying conduct "[n]ormally … would make the claim noncognizable." (*Ibid.*)

Despite this, the court recognizes defendant may have been prematurely cut off from his offer of proof (see Evid. Code, § 354, subd. (b)), as the trial court quickly ended discussion on the matter. Granting defendant the benefit of the doubt, we turn to the

---

**3**    Even if we did consider the arguments properly developed, we would find no abuse of discretion. (*People v. Maestas* (2005) 132 Cal.App.4th 1552, 1556 ["If a felony conviction does not necessarily involve moral turpitude, it is inadmissible for impeachment as a matter of law. [Citation.] Whether an offense constitutes a crime of moral turpitude is a question of law."].)

merits of his argument regarding the 2012 conviction. (See *Chatman, supra,* 38 Cal.4th at p. 373–374 [finding forfeiture but resolving the arguments on the merits as well].)

### 2. *Merits*

" '[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care [Evidence Code section 352]." (*Chatman, supra,* 38 Cal.4th at p. 373.) The trial court has broad discretion to admit or exclude the evidence underlying a prior misdemeanor conviction for impeachment purposes under Evidence Code section 352. (*Anderson, supra,* 5 Cal.5th at p. 407; see *People v. Wheeler* (1992) 4 Cal.4th 284, 296 ["The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues."].) Section 352 requires examining whether the probative value of the evidence is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) When the issue concerns a prior conviction of a witness who is not a defendant, "[t]he main factors … are 'whether the conviction (1) reflects on honesty and (2) is near in time.' " (*Anderson, supra,* 5 Cal.5th at p. 407.)

We assume for the sake of argument the conduct underlying the tipster's 2012 false information conviction reflects on her honesty. (See *People v. Castro* (1985) 38 Cal.3d 301, 315 [noting crimes of moral turpitude include those with dishonesty as an element (i.e., fraud or perjury) and those indicating a "general readiness to do evil" from which a readiness to lie can be inferred]; *People v. Maestas, supra,* 132 Cal.App.4th at p. 1556, fn. 4 [noting the crime of providing false information to a police officer can qualify as a crime of moral turpitude].) Even so, the trial court was within its authority to exclude evidence of the 2012 conviction on remoteness grounds. (*Anderson, supra,* 5 Cal.5th at p. 407.) Guiding factors for remoteness are the length of time elapsed since

the conviction, the length of the sentence served, the nature of the conviction, the age of the witness at the time of commission, and the witness's subsequent conduct. (*People v. Burns* (1987) 189 Cal.App.3d 734, 737–739.) The tipster's 2012 conviction for presenting a false identification to a police officer (§ 148.9) was from 12 years prior to the trial and a misdemeanor, and no evidence exists in the record indicating the tipster served any sentence. (See *People v. Mireles* (2018) 21 Cal.App.5th 237, 246–247 [applying *Burns* factors to witness's misdemeanors and finding no abuse of discretion in excluding on remoteness grounds].) Further, while the tipster did not live a completely legally-blameless life after 2012, the record indicates she only had one subsequent conviction from eight years prior to defendant's trial—a misdemeanor for driving on a suspended/revoked license, which is itself not a crime of moral turpitude. Thus, this case is distinguishable from cases where the defendant had subsequent convictions on crimes of moral turpitude, leading the court to find the defendant did not lead a "legally blameless" life. (Cf. *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925–926 [admitting evidence of remote convictions for the purpose of impeachment because the defendant had not led a blameless life due to multiple subsequent conviction for crimes of moral turpitude].)

In support of his argument, defendant cites cases where the appellate court found no abuse of discretion in the admission of a witness's past convictions for impeachment purposes. (See *People v. Bedolla* (2018) 28 Cal.App.5th 535, 556; *People v. Aguilar* (2016) 245 Cal.App.4th 1010, 1017; *People v. Gabriel* (2012) 206 Cal.App.4th 450, 456–459; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1056; *People v. Green* (1995) 34 Cal.App.4th 165, 183; *People v. Benton* (1979) 100 Cal.App.3d 92, 97.) However, these cases merely demonstrate the broad discretion afforded a trial court and not, as defendant argues, that we must find an abuse of this discretion here. (*See People v. Stewart* (1985) 171 Cal.App.3d 59, 65 ["When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which

merely afford an opportunity for a difference of opinion."].)  Cases where an appellate court found an abuse of discretion are factually distinguishable from the present case. (See, e.g., *People v. Almarez* (1985) 168 Cal.App.3d 262, 268 [finding the trial court erroneously ruled it had *no discretion* to exclude 13-year-old felony convictions because they were too remote].)

To the extent defendant argues the trial court did not provide a detailed analysis of section 352 at the pretrial hearing, we reject this argument.  "[W]hen ruling on [an Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so.  All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under [the statute]."  (*People v. Williams* (1997) 16 Cal.4th 153, 214; *People v. Clarida* (1987) 197 Cal.App.3d 547, 553 [finding even though the trial court did not expressly state all factors when weighing the admissibility of a prior conviction under section 352, the "content and context" of the arguments and ruling demonstrates the court did so].)

For these reasons, the court finds no abuse of discretion in the exclusion of the tipster's 2012 prior conviction.  (*People v. Clark* (2011) 52 Cal.4th 856, 932 ["Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion."].)

###### 3.  *Prejudice*

Finally, even if the trial court had erred in excluding the challenged evidence—we conclude it did not—we find no prejudice in the exclusion of the tipster's convictions and underlying misdemeanor conduct.  Defendant contends the exclusion of the tipster's prior convictions provided her with a false aura of credibility, which allowed the prosecution to bolster the girlfriend's inconsistent testimony.  Defendant contends that without this bolstering, the case would have been a "he-said she-said" contest between defendant and

11.

the girlfriend.  This argument ignores the other substantial inculpatory evidence in the record.

Most tellingly, defendant stated in text message to his colleague the day after the shooting that he kidnapped his girlfriend's kid because she had gone "MIA" after defendant "did some dumb s[***]" the night of the shooting.  The evidence against defendant also included pictures on defendant's phone of a gun of the same caliber used in the shooting, a DNA profile reflecting that defendant was five billion times more likely to be a contributor to the sample recovered from the bullet casing found near Buford with two other unknown individuals than that three unknown individuals were contributors, firearm parts, magazines, and a live nine-millimeter round in defendant's residence, two cigarette butts found in defendant's residence with the same markings as found in the park on the day of the shooting, the electric worker's spotting of the black sedan just outside the park on the night of the shooting, a sedan officers later linked to defendant, and the change of sedan's tires just after the shooting, as circumstantially related to the acceleration mark found outside the park on the night of the shooting.

Defendant contends because the exclusion of the tipster's six convictions impinged on his Constitutional rights to present a defense and to due process, the court should apply the more rigorous *Chapman* review for prejudice.  He also contends the court should review this issue under a *de novo* standard and not for abuse of discretion, given his allegations of Constitutional errors, citing *People v. Albarran* (2007) 149 Cal.App.4th 214, 224 and *People v. Seijas* (2005) 36 Cal.4th 291, 304.  This Constitutional issue was not raised below and is forfeited.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1203–1204 [reminding constitutional objections must be interposed before the trial judge so as not to forfeit them for appeal].)  Further, the issues resolved in *Albarran* and *Seijas* on *de novo* standard did not involve evidentiary issues, and as the People correctly point out, the *Albarran* court reviewed the evidentiary issues in the case for an abuse of discretion.  (*Albarran*, *supra*, 149 Cal.App.4th at pp. 224–225.)  Finally,

12.

courts have long rejected attempts by litigants to "inflate garden-variety evidentiary questions into constitutional ones …." (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [rejecting argument the court's exclusion of evidence violated the defendant's Sixth Amendment right to a defense and Fourteenth Amendment due process right, stating "[a]lthough completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense"]; see *Chatman, supra,* 38 Cal.4th at p. 372 ["Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance."].)

Thus, there is no reasonable probability a result more favorable would have been reached. (*Richardson v. Superior Court, supra,* 43 Cal.4th at p. 1050.)

## II. DISMISSAL OF FIREARMS ENHANCEMENT UNDER SECTION 1385

Defendant next argues the trial court abused its discretion when declining to fully strike the firearm enhancement or strike it and impose a lesser firearm enhancement. Defendant contends the trial court errantly focused only on his past and present danger to public safety, and not whether striking the enhancement would endanger public safety in the future. Defendant requests his sentence be vacated and the matter be remanded for resentencing. The People dispute these contentions and also argue remand is not necessary because it is unlikely the court will impose a different sentence.

We concur with defendant.

### A. Additional Background

Neither party filed a sentencing memorandum with the trial court. The probation report recommended defendant be sentenced to 15 years to life on the murder count and to a consecutive sentence of 25 years to life for the firearm enhancement. The report outlined defendant's extensive criminal history including one juvenile delinquency disposition, two prior misdemeanor convictions in 2001 and 2003, 13 prior felony

13.

convictions between 2003 and 2016, and five parole/mandatory supervision violations; none of these were of a violent nature in the same sense as the murder of Buford. Defendant also had seven cases pending at the time of sentencing—five misdemeanors and two felony firearms charges.[4]

At the April 2, 2024 sentencing hearing, defendant requested the court strike the firearm enhancement under section 12022.53(d) and sentence appellant only to 15 years to life on the murder. Defendant cited the testimony of his family friend who testified she knew defendant to be a "caring, loving, merciful" person; and the fact that defendant's other convictions were not of the same character as the murder. At the time of sentencing appellant was 40 years old. The prosecutor argued the enhancement was "completely warranted" because over the last 20 years, defendant had shown the "court and society exactly what kind of man he is and exactly what kind of character he has."

The court stated the prosecution had appropriately sought a second degree murder conviction. The court then cited section 1385 and Senate Bill No. 81 (2021–2022 Reg. Sess.) as related to the firearm enhancement, noting it was "mindful of the changes in the law and the analysis that needs to be done."[5] The court noted section 1385, subdivision (c)(2) lists nine mitigating circumstances that can "weigh greatly in favor of dismissing the enhancement, unless the [c]ourt finds that dismissal of the enhancement would endanger public safety." The court recounted the nine circumstances, finding applicable only section 1385, subdivision (c)(2)(C)—that the enhancement would result in a sentence of over 20 years. The court stated it was mindful of the great weight to be

---

[4]     The prosecution moved to dismiss all other pending cases.

[5]     The court stated section 1385, subdivision (c)(2) "creates a rebuttal of presumption [sic] in favor of … striking that enhancement." At the time of the sentencing hearing, some courts used this framework to analyze section 1385. (See *People v. Walker* (2022) 86 Cal.App.5th 386.) Four months later, the California Supreme Court rejected the rebuttable presumption approach. (See *People v. Walker* (2024) 16 Cal.5th 1024, 1028–1029 (*Walker*).)

assigned to this mitigating circumstance, but believed striking the enhancement was improper because to do so would endanger public safety. To support this conclusion, the court cited: (1) the use of the firearm by defendant was "very serious," as the gun was "just a few feet away from … Buford's head when it was fired directly into his face," "a close-range shot"; (2) "the harm … caused was the gravest of all harm, and the victim lost his life in a very tragic way"; and (3) "the manner in which the firearm was used was very serious," because with "one shot to the head …, there's no need for more shots." The court also noted defendant's meth use at the time of the murder. On this reasoning, the court concluded "dismissal of this enhancement would endanger public safety" and so it refused to strike the enhancement.

### B. Legal Standards

A trial court's decision not to dismiss an enhancement pursuant to section 1385 is reviewed for abuse of discretion. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.) " '[A]n abuse of discretion arises if the trial court based its decision on impermissible factors … or on an incorrect legal standard.' " (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225 (*Gonzalez*).) "A court acting while unaware of the scope of its discretion is understood to have abused it." (*People v. Tirado* (2022) 12 Cal.5th 688, 694 [reminding that a defendant is entitled to sentencing decisions "made by a court exercising informed discretion."].)

### C. Analysis

On January 1, 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) went into effect (Stats. 2021, ch. 721, § 1), amending section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.) Section 1385, subdivision (c)(1), provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so …." Subdivision (c)(2) elaborates:

"In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)

Subparagraphs (A) to (I) list nine distinct mitigating circumstances, including, as is relevant here, subparagraph (C) where "[t]he application of an enhancement could result in a sentence of over 20 years." Subparagraph (C) states "[i]n this instance, the enhancement shall be dismissed."

In *Gonzalez,* the court confronted a situation similar to defendant's case. (*Gonzalez, supra,* 103 Cal.App.5th 215.) Therein, the trial court declined to strike a 25-to-life firearm enhancement under section 1385 because it believed it was required to decide whether the defendant represented a danger to society at the time of sentencing. (*Gonzalez, supra,* at p. 227.) The court of appeals held this interpretation was unsupported by a plain reading of the statute, which focuses on the danger associated with the dismissal of an enhancement. (*Id.* at p. 228.) The court stated "[a]lthough the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence." (*Ibid.*) The court believed that, for a defendant facing a "lengthy indeterminate sentence," the inquiry "should also take into account that the defendant's release from prison is contingent on review by the Board of Parole Hearings (and for murder convictions, by the Governor), who will have the opportunity to assess the defendant's dangerousness at that time." (*Ibid.*) The court concluded this "future review will act as a safety valve against a release that would endanger the public and is

16.

relevant to a trial court's analysis of whether the dismissal of an enhancement imposed on a defendant serving an indeterminate prison term will endanger public safety." (*Ibid.*)

Here, similar to *Gonzalez*, the trial court erred in deciding whether striking the enhancement would endanger public safety because, as the record of the sentencing hearing indicates, it focused solely on defendant's past conduct and the circumstances of the murder. (See *Gonzalez, supra,* 103 Cal.App.5th at p. 228.) In finding danger to public safety, the court explicitly cited defendant's "very serious" use of the firearm in a "close-range shot" to Buford's face; the fact this "close-range shot" meant there was "no need for more shots"; and the fact that Buford lost his life from the shooting. This is not to say the trial court was barred from relying on these considerations when determining whether to strike the 25-to-life firearm enhancement on public safety grounds. (See *People v Mendoza, supra,* 88 Cal.App.5th at p. 299 [finding a trial court did not abuse its discretion when it determined dismissal of the enhancement would likely endanger public safety in part because the defendant's past conduct was " 'incredibly harmful and dangerous' "].) However, in the context of section 1385 subdivision (c)(2), the key question is forward looking—whether *striking the enhancement* would likely endanger public safety. (§ 1385, subd. (c)(2).) Thus, even if the trial court struck the enhancement, defendant would still be serving an indeterminate 15-to-life term with parole eligibility subject to the Parole Board and Governor's review. (See § 3041.) The trial court must consider this future-looking issue for purposes of "public safety."

The People argue we could find the trial court impliedly weighed the mitigating circumstance of section 1385 subdivision (c)(2)(C) against defendant's criminal history, the danger he posed to public safety, and the circumstance of the offense under the "holistic balancing" test espoused in *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1096. (See *Walker, supra,* 16 Cal.5th at p. 1029 [concluding "the plain language of section 1385, subdivision (c)(2) establishes a standard consistent with *Ortiz*"].) We are mindful that trial courts are " 'not required to state reasons for declining to exercise its

17.

discretion under section 1385' [citations], and '[are] presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary.' " (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637.) However, given the clear command of section 1385 that courts consider public safety in the context of striking the enhancement, we will not infer such findings where the record demonstrates the trial court was solely focused on past and current dangerousness in determining the public safety issue. (See *Gonzalez, supra,* 103 Cal.App.5th at p. 228 [noting the "crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence"].) Simply, nothing in the record suggests the trial court considered the impact striking the enhancements would have on defendant's sentence, given that he was 40 at the time of sentencing and will be approximately 55 before being eligible for parole. (See *People v. Williams* (2018) 19 Cal.App.5th 1057, 1063 ["A defendant who would obtain immediate release if the petition is granted poses a different potential danger to society than a defendant who could be released only in his or her 70's."].)

Nor can defendant's sentence be affirmed for harmless error as the People argue. Defendant is correct that the "default" disposition is to remand for resentencing unless the record "clearly indicates" the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." (*People v. Salazar* (2023) 15 Cal.5th 416, 431.) True, the trial court may find the facts it previously cited constitute "substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Walker, supra,* 16 Cal.5th at p. 1038.) However, we cannot say the record clearly indicates the same sentence would result, as the trial court may find no facts to support such countervailing factors, as well as that defendant would not be a danger to public safety under subdivision (c)(2) given the length of his sentence. (See *Gonzalez, supra,* 103 Cal.App.5th at pp. 231–232 [rejecting harmless error because there was "no clear indication in the record that the trial court

18.

would have declined to dismiss the firearm enhancement if, rather than limiting its inquiry to [the defendant's] current dangerousness, it had analyzed whether public safety would be endangered by the sentence of 50 years to life that would result from dismissing the firearm enhancement"].)  This is especially true given that the trial court not only has the authority to strike the enhancement but also to impose a lesser firearm enhancement. (*People v. Tirado, supra*, 12 Cal.5th at p. 701.)  While we are remanding the matter, we take no position on whether the trial court should or should not strike the enhancement. (See *Gonzalez, supra,* 103 Cal.App.5th at p. 232.)

## DISPOSITION

The sentence is vacated, and this matter is remanded for the trial court to conduct a full resentencing proceeding consistent with this opinion.  In all other respects, the judgment is affirmed.


FRANSON, Acting P. J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.